NO. 07-04-0060-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D

SEPTEMBER 23, 2004

_____

IN THE INTEREST OF S.M.L.D., A CHILD

_____

FROM THE 320TH DISTRICT COURT OF POTTER COUNTY;

NO. 66,038-D; HONORABLE DON EMERSON, JUDGE

_____

Before QUINN and REAVIS and CAMPBELL, JJ.

**OPINION**

Appellants Shelly Carter and Dwayne Lynn Dale appeal the termination of their parental rights to the child S.M.L.D. The child was removed from Carter's care after the child tested positive for cocaine and methamphetamines at birth. We will affirm the trial court's judgment.

On August 2, 2002, Carter went to the hospital and was informed by the hospital staff that her baby was to be delivered that day. After arguing with the anesthesiologist, Carter left the hospital and went home. When she arrived home, Dale, the child's father,

was there smoking crack cocaine. Carter testified that she "took a hit" of cocaine at that time. S.M.L.D. was born on August 5, 2002, and tested positive for both cocaine and methamphetamines at the time of her birth. The child suffered from drug withdrawal symptoms and, as a result, was placed in a neonatal intensive care unit for a week following her birth. To alleviate symptoms of withdrawal from the drugs, she was medicated with phenobarbital for several days. On her release from the hospital August 9, she was taken into the possession of the Texas Department of Protective and Family Services.

On August 12, 2002, the department filed an original petition for protection of the child and seeking conservatorship. A full adversary hearing was held August 22, 2002, and the department was appointed temporary managing conservator of the child. In October of 2003 the department amended its original petition to seek termination of parental rights of Carter and Dale, if reunification of the child with the parents could not be achieved. On December 22, 2003, a final hearing was held and neither parent appeared. A judgment was entered terminating Carter's and Dale's parental rights. Both Carter and Dale filed motions for a new trial alleging they did not receive notice of the final hearing. The motions for new trial were granted and another final hearing was held on February 13, 2004, at which both parents appeared represented by counsel. Following the non-jury trial, a judgment was entered terminating the rights of both parents. The department was named managing conservator of the child. Both Carter and Dale filed timely notices of appeal.

### *Issues*

Carter and Dale each present two issues, that the evidence presented at trial was legally insufficient and factually insufficient to support the judgment of termination under Section 161.001.[1] They also challenge the court's finding that termination of their parental rights was in the best interest of the child. The judgment may be affirmed if it is supported by evidence sufficient to establish that one of the grounds listed in Section 161.001(1) exists and that termination is in the best interest of the child as required by Section 161.001(2). *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re P.E.W.*, 105 S.W.3d 771, 777 (Tex.App.–Amarillo 2003, no pet.).

The trial court found that appellants knowingly placed or allowed the child to remain in conditions or surroundings which endangered the physical or emotional well-being of the child, Section 161.001(1)(D); that appellants engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the physical or emotional well-being of the child, Section 161.001(1)(E); and that termination of parental rights between appellants and their child was in the best interest of the child, Section 161.001(2). Because we find the evidence sufficient to support the findings under Section 161.001(1)(E) and Section 161.001(2), we consider only the evidence addressing those grounds.

---

[1]All references in this opinion to Section 161.001 are to Texas Family Code Annotated § 161.001 (Vernon 2002).

### *Law*

Findings under Section 161.001 must be based on clear and convincing evidence. Clear and convincing evidence is the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. Tex. Fam. Code Ann. § 101.007. The clear and convincing evidence burden of proof requires a higher level of appellate scrutiny in reviewing the legal and factual sufficiency of the evidence. *In re J.F.C.*, 96 S.W.3d 256 (Tex. 2002); *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002).

In reviewing legal sufficiency, we look at all the evidence, in the light most favorable to the judgment, to determine if the trier of fact could reasonably have formed a firm belief or conviction that grounds existed for termination under the Family Code. Tex. Fam. Code Ann. §§ 161.001, 161.206(a) (Vernon 2002 & Supp. 2004); *In re J.F.C.*, 96 S.W.3d at 265-66. In review of a factual sufficiency challenge we must consider all the evidence the fact finder could reasonably have found to be clear and convincing, determining whether, on the entire record, the fact finder could reasonably form a firm belief or conviction of the truth of the department's allegations. *See In re J.F.C., 96 S.W.3d* at 266; *In re C.H.*, 89 S.W.3d at 25, 27-29. In so doing, we consider whether disputed evidence is such that a reasonable fact finder could have resolved it in favor of its finding. If, in light of the entire record, disputed evidence that a reasonable fact finder could not have resolved in favor of the finding is so significant as to prevent a fact finder reasonably from forming a firm belief

or conviction of the truth of the finding, then the evidence is factually insufficient. *See In re J.F.C.*, 96 S.W.3d at 266.

In the context of our review of the evidence that appellants' conduct endangered the child's physical or emotional well-being, to "endanger" means to expose to loss or injury; to jeopardize. *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Although "endanger" means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child must actually suffer injury. *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). A danger to the child's well-being may be inferred from parental misconduct. *Boyd*, 727 S.W.2d at 533. An endangerment inquiry under Section 161.001(1)(E) focuses on the conduct of the parent, including the parent's actions or omissions or failures to act. *See In re D.T.*, 34 S.W.3d 625, 634 (Tex.App.–Fort Worth 2000, pet. denied).

### *Endangerment - Carter*

We first consider the legal sufficiency of the evidence Carter engaged in conduct that endangered S.M.L.D.'s physical or emotional well-being. On appeal Carter argues that the only evidence before the trial court bearing on that issue concerned her conduct after the child was removed from her possession. She argues that she could not have endangered the child physically or emotionally during the limited interaction she was permitted with the infant after her birth. Carter's argument ignores the effect of her drug use on her unborn child, and case law establishing that a mother's use of drugs during

pregnancy may be conduct which endangers the physical and emotional well-being of the child. *In re W.A.B.*, 979 S.W.2d 804, 807 (Tex.App.–Houston [14th Dist.] 1998, pet. denied); *see In re U.P.*, 105 S.W.3d 222, 234 (Tex.App.–Houston [14th Dist.] 2003, pet. denied)*; Dupree v. Texas Dep't Protective and Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex.App.–Dallas 1995, no writ).

Carter admitted that she used cocaine two days before her child's birth, even though she knew it could be dangerous to the unborn child. A department caseworker testified that immediately after birth, the child was placed in a neonatal intensive care unit for over a week, suffering withdrawal symptoms from exposure both to cocaine and to methamphetamines. Evidence of Carter's drug use during pregnancy, and the distress suffered by the child after delivery, demonstrates how Carter harmed the physical well-being of the child. Carter's ingestion of drugs while pregnant did more than expose the child to injury; *see Boyd*, 727 S.W.2d at 533, it brought about actual physical harm to the infant.

Termination under Section 161.001(1)(E) typically requires evidence of more than a single act or omission. *In re D.M.*, 58 S.W.3d 801, 812 (Tex.App.–Fort Worth 2001, no pet.); *In re J.N.R.*, 982 S.W.2d 137, 142 (Tex.App.–Houston [1st Dist.] 1998, no pet.). In determining whether a parent has engaged in a course of conduct endangering a child, we may look at the conduct both before and after the child's birth. *In re D.M.*, 58 S.W.3d at 812; *In re M.J.M.L.*, 31 S.W.3d 347, 351 (Tex.App.–San Antonio 2000, pet. denied); *Avery v. State*, 963 S.W.2d 550, 553 (Tex.App.–Houston [1st Dist.] 1997, no writ). The evidence

is that Carter's ingestion of cocaine before the birth of her child was not an isolated event, but was part of a course of conduct of the use of illegal drugs. *See In re R.W.*, 129 S.W.3d 732, 739 (Tex.App.–Fort Worth 2004, pet. denied) (court may consider drug use and its effect on parent's life and ability to parent as contributing to endangering course of conduct); *In re U.P.*, 105 S.W.3d at 234; *Dupree*, 907 S.W.2d at 84. Carter testified she used marijuana during the first three months of her pregnancy. Her drug use continued after the child was removed from her care, in the face of periodic drug tests that placed her relationship with her child in jeopardy. *See In re J.N.R.*, 982 S.W.2d at 142 (considering conduct jeopardizing parental rights as part of course of conduct endangering well-being of child). The department, as part of her service plan, required Carter to submit to random drug tests. The caseworker testified she did not submit to all the testing required by her service plan. Nevertheless, testimony indicated she tested positive for drugs in June, July and December of 2003.[2] The record contains sufficient clear and convincing evidence for the court to have reasonably formed a firm belief or conviction that Carter engaged in conduct that endangered the physical and emotional well-being of her child, and is thus legally sufficient to support that finding. Tex. Fam. Code Ann. § 161.001(1)(E).

Considering the entire record, the evidence also is factually sufficient to support the finding. The facts of Carter's cocaine use prior to S.M.L.D.'s birth and of its effect on her child are not disputed. There was conflicting testimony at trial concerning the number of

---

[2]Further evidence of Carter's drug use after S.M.L.D.'s birth is provided by the letter from her therapist Sorrels, discussed later in this opinion.

-7-

Carter's positive drug tests during the months before trial, but the conflict in evidence is one the court could resolve in favor of its finding. *See In re J.F.C.*, 96 S.W.3d at 266.

### *Endangerment - Dale*

We apply the same analysis to the court's finding that Dale engaged in conduct or knowingly placed S.M.L.D. with persons who engaged in conduct that endangered the physical or emotional well-being of the child. Dale argues he never took any actions to harm the child. He contends his rights were terminated only because he had been incarcerated for the majority of the child's life. Like Carter, Dale ignores the danger to S.M.L.D. from Carter's use of drugs two days before her birth. In considering whether Dale had engaged in endangering conduct, the court was entitled to take into account his role in the presence of cocaine in the child's body at birth. *See Dupree*, 907 S.W.2d at 85. At trial, Dale acknowledged providing Carter the cocaine she smoked before S.M.L.D.'s birth.

The court also could consider the effect of Dale's drug use on his life and ability to parent S.M.L.D. *See In re R.W.*, 129 S.W.3d 732, 739. The effect of drug use on Dale's life was illustrated during his testimony by his agreement with the attorney ad litem that, when he gave Carter a "hit" off the crack cocaine he was smoking, he was "just too high" to think about the consequences. Dale also acknowledged at trial his addiction to drugs. Although Dale testified to a desire to abstain from drugs, and to his participation in a twelve-step recovery program required by the department, he acknowledged continued drug use.

Dale attended trial, but was incarcerated at that time, following revocation of his parole. He testified he would remain incarcerated for nine to eighteen months. He also testified his drug use was a cause of the revocation.[3]

A parent's mere imprisonment is not conduct that endangers the emotional or physical well-being of a child, but it is a factor the court could consider on the issue of endangerment. *See Boyd*, 727 S.W.2d at 533-34; *In re R.W.*, 129 S.W.3d at 743; *In re D.T.*, 34 S.W.3d at 638.; *In re J.N.R.*, 982 S.W.2d at 142. Dale's imprisonment was at least partially the result of his course of conduct of using illegal drugs and, coupled with the other undisputed evidence of that course of conduct and its effect on the well-being of the child, provides both legally and factually sufficient evidence that he engaged in conduct that endangered S.M.L.D.'s physical and emotional well-being. *See In re R.W.*, 129 S.W.3d at 739; *Dupree* at 84.

### Best Interest of Child

We next address whether the department established that termination of Carter's parental rights was in the best interest of the child, overcoming the strong presumption that the best interest of a child is served by keeping custody in the natural parent. *See, e.g., In re D.M.*, 58 S.W.3d at 814. *Holley v. Adams*, 544 S.W.2d 367 (Tex. 1976), sets out factors that may bear on the question of best interest, including desires of the child; emotional and physical needs of the child now and in the future; the emotional and physical danger to the child now and in the future; parental abilities of the individuals seeking

---

[3]Dale's testimony also indicated he was charged with assaulting Carter's adult son.

custody; programs available to assist these individuals to promote the best interest of the child; plans for the child by these individuals or by the agency seeking custody; the stability of the home or proposed placement; the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and any excuse for the acts or omissions of the parent. *Id.* at 371-72. The *Holley* list is not exhaustive, though, and evidence on each factor is not required to support a finding that termination is in the child's best interest, particularly if there is undisputed evidence that the parental relationship endangered the safety of the child. *In re C.H.*, 89 S.W.3d at 27.

The evidence offered to prove grounds for termination is also relevant in determining if termination is in the child's best interest. *In re C.H.*, 89 S.W.3d at 28. We have stated our conclusion that Carter's course of conduct involving the use of drugs posed a danger to her child.

The evidence concerning Carter's willingness and ability to address her drug usage was conflicting. Testimony indicated that the department referred Carter to Ms. Sorrells, a therapist, with whom she met once a week for approximately eleven months, beginning sometime after the birth of S.M.L.D. Even though Sorrells was designated by the department to treat Carter, at some point the department concluded she was not making progress with Sorrells and transferred Carter to a new therapist. On Carter's counsel's cross-examination of department caseworker Rachel Buckalew, an excerpt from a letter written by Sorrells was read into the record. In the letter, Sorrells stated that Carter admitted her drug use and had developed a plan to prevent relapse into drug use. Sorrells reported that Carter consistently attended counseling sessions and when CPS determined

she should see a new therapist, Carter wanted to continue with Sorrells at her own expense.

The letter indicated Carter was willing to undergo more intense treatment, such as inpatient rehabilitation, if needed. Sorrells stated that Carter was beginning to address her problems when a change in therapist was ordered by the department. Buckalew's testimony controverted the conclusions stated in Sorrells' letter. Buckalew testified that when she called Sorrells to complete a report to the court, she "stated everything differently" than what appeared in the letter. Buckalew did not believe Carter had made any progress in addressing her drug abuse problem. Buckalew testified that Carter tested positive for controlled substances in June, July and December 2003.

Carter also testified concerning her counseling experience with Sorrells and concerning her drug usage. Carter testified she wanted nothing to do in the future with persons who use drugs. Sorrells' letter indicated Carter's relapse prevention plan included staying away from people and places associated with drugs. Considering the entire record, and keeping in mind the role of the trial court in a bench trial as judge of the credibility of witnesses,[4] the evidence does not prevent the conclusion that Carter would continue her course of conduct involving drug abuse, endangering her child in the future.

---

[4]Even under the more stringent standard of review we must apply to termination findings, we must maintain due regard for the role of the fact finder. *See In re C.H.*, 89 S.W.3d at 26. That role includes the task of resolving credibility issues and carries with it the authority freely to choose to believe all, part or none of the testimony of a particular witness. *See In re R.D.S.*, 902 S.W.2d 714, 716 (Tex.App.–Amarillo 1995, no writ).

Carter testified she was forty years old. She and Dale had never married, but had been together for fifteen or sixteen years, "on and off." Testimony also revealed they had no other children together, but each had two other children. Carter's two children were adults, ages 19 and 21. Dale's two children were teenagers, living with his ex-wife.

The evidence concerning the stability of the home Carter would provide the child also was mixed. On appeal, Carter cites evidence that she had, until two months before trial, maintained a home. She resided in a rented house for six years, but was evicted two months prior to trial when she lost HUD funding for the home. Her testimony indicated she did not have a permanent place to live and was uncertain where she would be living in the future.[5] At the time of trial, Carter was unemployed and had not held a job for two years. Carter also testified she was diagnosed with hepatitis C during her pregnancy with S.M.L.D.

Carter argues she demonstrated her care and concern for the child by attending the visitation the department allowed her. She argues she had no opportunity to establish a relationship with her child because the department took custody of S.M.L.D. at the hospital. Evidence indicates that Carter complied with some of the department's requirements in an effort to regain custody of her child by completing the FAME program and parenting classes.

---

[5]Carter testified she had stayed with her adult son temporarily since her eviction and had kept her furniture and dogs at his residence. She also testified, though, that she was "not getting along" with her son. Dale testified his parole violation involved, in part, a charge that he assaulted Carter's son. Carter also testified that, by the time of trial, both her son and her daughter were incarcerated.

The evidence concerning the best interest of the child with respect to termination of Dale's parental rights included Dale's testimony that while incarcerated, he met the department's requirements by taking a parenting class and receiving counseling. He and Carter both testified that Dale regularly maintained employment when not incarcerated. As noted, though, Dale admitted to continued drug use. He twice had participated in a SAFPE[6] program, but continued using drugs when he was released on parole and even when participating in a twelve-step recovery program. He candidly acknowledged that "there's really no guarantee" the next few years would be different from recent years with respect to his drug use.

Dale offered no specific plans for caring for S.M.L.D.'s needs. When Dale was asked where S.M.L.D. should be placed until he was released from prison, he requested she be returned to Carter. The future of Dale's relationship with Carter is unclear from the testimony. Carter testified that Dale planned to come live with her on his release from prison, but that plan is difficult to reconcile with Carter's expressed intention to avoid drug abusers, given Dale's admitted continuing problem with drug abuse.

The uncontroverted evidence supporting the trial court's finding that Carter engaged in conduct endangering her child's well-being, together with the evidence of the likelihood of further danger to the child's well-being from her drug abuse, and evidence of her inability to provide for the needs of the child, including Carter's lack of employment and of a place to live, support the court's finding that termination of Carter's parental rights was in

---

[6]Substance Abuse Felony Program. Tex. Crim. Proc. Code Ann. art. 42.12 § 14 (Vernon Supp. 2004).

S.M.L.D.'s best interest. Similarly, the undisputed evidence of Dale's endangering course of conduct and of his continuing drug abuse, his lack of any plan for the infant's care other than her return to Carter, and the uncertainty of Carter and Dale's own future, support the same finding with respect to Dale. With respect both to Carter and Dale, evidence contrary to the finding came largely through their own testimony, and in any event was not so significant as to prevent the trial court reasonably from forming a firm belief or conviction of the truth of the finding. *See In re J.F.C.*, 96 S.W.3d at 266. At the time of trial, S.M.L.D. remained in foster care and appeared well bonded to her foster parents. The department plans to allow the child to be adopted. The record contains legally and factually sufficient clear and convincing evidence for the court to have determined that termination of the parent-child relationship between the child and each of her biological parents was in the child's best interest.

Accordingly, we overrule the issues urged by Carter and by Dale, and affirm the trial court's judgment.

James T. Campbell
Justice

-14-